matter under advisement. We'll call our last case of the day, number 13-2354, Powell v. Weiss et al., Mr. Zeiger, Ms. Neal, and Mr. Robinson. Whenever you're ready. Good morning, Your Honors. If it pleases the Court, I respectfully request to reserve three minutes for rebuttal. Okay. If you'd give your name and who you're representing. Brian Zeiger for the plaintiff. Darrell Powell. Good morning, Your Honor. Okay. The first, just to bat one ball out of the air, it seems that you're not really, you waive the issue of whether the District Court properly dismissed the claims against the defendants Pottinger, Yale, and Wessel. Pottinger and Wessel, I agree with you. Yale, we didn't write on, but it's clear from the Commonwealth Court decision that Yale is the supervisor of Weiss and had direct input into what was going on. Mr. Weiss is quoted in the opinion of the Commonwealth Court that we attached his Exhibit A to the original complaint, where he's saying that he made the decision based on the advice of counsel, that obviously Ms. Yale has to have some kind of personal involvement. But again, I have no factual basis for that, so as an officer of the Court, I can't write about that in my brief for you. That's a good answer, but I mean, is that what you noted in your briefing? You really didn't deal with it, did you? I didn't, because I don't think it's appropriate to make up facts in a brief. I know, it's a tough one. It's a tough one. I mean, it's just so much different than the other two people that Your Honor just asked me about. I mean, the other two, I have no factual basis, but obviously, defendant Yale has personal involvement in this. I just don't know what it is. So at this point, for today's purposes, is there really any need for Mr. Robinson to talk at all? I don't think so. Okay. You're off the hook. My wife tells me that all the time. So Ms. Neal will give you the full 15 minutes. Okay. Let's go on to the other, to Mr. Weiss and the back and forth between consecutive and concurrent and what's happening. Okay. So he was originally sentenced and the Superior Court reversed the sentencing. He was resentenced and there was a question of whether or not the aggregate sentence should have been six and a half to 13 years or it should have been five to 10 years. And the Commonwealth Court ruled that it was, well, the state actually asked them to grant the original petition in the Commonwealth Court in Mr. Powell's favor to make it five to 10. And then after they did that, they went back and reviewed it again on their own volition and then changed it back to where they had it before, which was the six and a half to 13. At which time Mr. Powell filed the second action in the Commonwealth Court. And at that time is when the Commonwealth Court ordered the state to make it again five to 10 in the published opinion. So the really, respectfully to your honor, there really is no dispute over the fact that the sentence was five to 10 and the sentence should have been five to 10. And of course, we all know under the rule of criminal procedure in Pennsylvania that once 30 days passes after sentencing that the court no longer has jurisdiction to reopen the matter unless one of the parties files something. And so the state writing a letter to them under a case they cite to called Brandt doesn't really apply after the 30 days has passed when it's clear what the order is. So in this case, I don't think there's any dispute between any of the parties that the aggregate sentence was five to 10, not six and a half to 13. Can I ask you, and I'll ask the same question to Ms. Neal, that I don't understand completely the responsibilities here. The complaint alleges that Weiss calculated Powell's sentence, and Weiss is with DOC, Department of Corrections, is that correct? What department people work for is none of my business. Okay, but the complaint alleges that he calculated the sentence. The law provides that DOC is responsible for calculating maximum and minimum terms. The law also provides that state parole is under the responsibility of the Bureau of Prisons. Is that correct? Okay. All right. How did the responsibilities for setting parole and maximum, minimum sentence terms intersect here? It only, that really, respectfully to the court, that's not really my understanding of how it works. There's a sentencing judge that gives a sentence, and it's five to 10. And so if it's a five to 10-year sentence, then that's the sentence. The Department of Corrections has no standing or input to alter the five to 10-year sentence. At some point, the parole board can then decide at what point after the person has served a minimum of five years to what point parole can be granted, if at all. And so at that point, once the person's granted parole, the parole people supervise that person, like there's a parole officer for that. The only time that the Department of Corrections comes into any business on sort of calculating is when there's more than one sentence, and we have to figure out what the aggregate of those sentences are, which is what we have here. This is what you have here. So in general, though, they have no standing or business getting into any computation of sentence. So in a case where someone has three cases like we have here, you're looking at what the total aggregate is, and by that, whether those sentences are meant to be consecutive or concurrent. And basically, under the rules of Pennsylvania criminal procedure, as cited in the Commonwealth Court opinion, the sentencing courts have to state on the record whether they are to be served consecutive or concurrent. There is a case that's called Brant's that they rely on in that opinion, where they say that the Department of Corrections can contact the judge to get clarity on things, but that the record itself is what applies. And the Commonwealth Court was not willing to extend Brant, and in fact distinguished it in the Commonwealth Court opinion to say that Brant did not apply, because here it was clear because Judge Ransom said concurrent to all other cases. And they cite the record of what's actually on the record in the courtroom, not what the correspondence between the Department of Corrections is. So while they do have power to make that computation, they're not making any decisions. They're not making any interpretations. They're just going by what the record is in the courts and applying what that is. And I think that's really, you know, it distinguishes it from what I think your question might be. Can I turn to the harm? Yeah, go ahead. The harm that your client alleges, as I understand it, is twofold. One is he's told you're going to go to a community correction center, but then he doesn't get that. That's retracted. And the other harm is he was kept on parole for seven months when he was not subject to parole. Right. But he was incarcerated 17 months longer than he was. Approximately. Until we do discovery, I couldn't say for sure. I guessed at 17 months, but I'm pretty good at that. All right. So with respect to the first aspect, the community correction center retraction, you cited Askwith in your brief. And Askwith mentions that residency in a halfway house still constitutes institutional confinement. So how can you persuade us that your client had a liberty interest that he was deprived of when he wasn't sent to the CCC? It's a two-part issue. So, one, we have to look at cases where the person has been granted to the person already, and then cases where it hasn't been granted. They're saying it should have been granted. Right. So we're only looking at cases in the first priority. No, you'd be in much better footing if your client spent one day or three days in the CCC. Right. You have a much better argument. Right. That's my concern with your case. No, but I think that once it's granted, that the case law is clear, especially under Young v. Harper, that it is clear that the liberty interest begins at that point. But the question about Askwith is, if you read those cases in the fact pattern, on that line of cases, the reason that it's taken is all based on the conduct of the plaintiff or then the criminal defendant. So, for example, the reason why those people are being taken out of the program that they're in is because they do something to violate the rules of the program they're at. It's not based on some arbitrary reason. No, but you don't get a right. I mean, a guy who, pause it for a minute, a guy who gets sent to administrative, you know, RHU, restrictive housing, the hole, whatever you want to call it, he doesn't have a due process right. And let's assume it's some terrible prison guard who's just off on a toot and has a grudge against the guy, sends him to the hole. It's wrong. It's awful. That man doesn't have a right to a hearing because he's in institutional confinement. So if Asquith says institutional confinement is a halfway house, why isn't this Community Correction Center here part and parcel of that institutional confinement that does not even give rise to a liberty interest? Because the Supreme Court case law in Young v. Harper says that once it's granted and you're at, you have a minimum amount of a liberty interest there, and there's no case in this circuit following Young v. Harper where it says, where they're actually, you know, been given that benefit that they say you're going to get parole. So you want us to just follow Young v. Harper on that? I want the court to just rule for me. I don't care what case you follow. All right. I don't want to monopolize the time, but then briefly with respect to the, that was a brilliantly simplistic answer. With respect to the second aspect of harm, I reviewed your complaint again to try to ascertain what harm befell your client during the seven months of parole, and I didn't see any allegations of harm there other than the fact that, hey, he was on parole. Where are the allegations of harm there? We just have to look at ourselves as humans and understand that if any of us had a choice to be incarcerated at a SCI in Pennsylvania. He's out. He's on parole. Oh, I'm sorry. You're talking about the seven months. He's seven months. He's at liberty, and I didn't see, for example, I'm looking in the complaint for the parole officer was bothering him. He had to come downtown, bus fare. He couldn't get employed because he was still subject to parole. I didn't see any allegations of harm in that respect. I'm sorry. First, I misunderstood. I thought you were talking about the other part of the case. My answer is there's not much. It's a scintilla. It's a minimum amount. But I wanted the court, the judge in the case, or the jury in the case, or this court to be outraged, as was I, when I realized the kind of thing that was going on here. In other words, they'd been to the Commonwealth Court twice. They were told, you know, come on, make it five to ten, twice by the Commonwealth Court. After that, they claim they make it five to ten. They actually release the man, and yet they have him on parole outside the maximum of the original sentencing, which was the order from the Commonwealth Court twice. How does it fall outside of HECC? No, it's outside of the HECC. How does it fall outside of HECC? Because we're not asking that anything be changed. We're just asking that the Commonwealth Court order be followed. So you're making a wrongful supervision claim. The wrongful supervision claim doesn't invalidate the conviction. At all. I understand that. But you just went, respectfully, I'm not sure you answered my question. I was asking you about the harm. Where have you pleaded the harm? And the answer that I heard you give me was this Keystone Cops routine by the Pennsylvania court system is outrageous and unfair. Okay, let's assume you're right about that. Where's the, under, Twombly, under ICPO, you have to plead some harm. It's not, otherwise, this seven months on parole, if nothing befell him that was adverse, it's the proverbial tree falling in the forest. You don't have a claim. Respectfully to the court, I've never been on parole, and I'm guessing none of the judges have either, but one day on parole by itself speaks to harm. But yet anyway. Yes. It's a res ipsa locator if you're on parole. I've been to the parole office, personally. Did you plead that your client went to the parole office? No, I don't believe I did. And did you plead he had to give urine samples, he was tested, he couldn't get anything? Is there anything in the complaint? Respectfully to the court, obviously not. And again, even if I had, the amount of harm, as I said, is a scintilla of harm. The meat of the case is based on that they granted him to go to the CCC. But he was, what, four days away before they took it back, correct, before the deal? And the real question is, getting down to the crux of it, on that issue, when does a liberty interest attach? Normally, if you revoke something and you're already into a program, and although there's an incursion to that in ASQUITH, normally there is a liberty interest that attaches. But if you're looking to getting into a program, it seems that a liberty interest normally does not attach until you're already there. Now, it may have been keystone cops as to how the DOC acted here, but it seems like there is at least an effort to try to come up with an easily understandable test that's black and white as to whether one has a liberty interest. I think it's once granted, and I believe that the court should follow Young v. Harper, which is a Supreme Court case. Yeah, that's the 97 case of the Supreme Court, but how does it help your case here? I say once granted, once they grant it to him, and the reason it's revoked is because of some arbitrary administrator who does that, it's created. All right. So if this were just a mistake one day, you're in the same position? You mean, had he been in custody for one day longer? No. If the mistake with regard to assignment was one day, you'd have a claim on that? I just don't understand what the one day is. I'm not following the court. I'm sorry. One day of being under the impression that you'd be in a particular place, and you're removed to that place, and then you're moved back. I think the theme of the previous argument was it depends. I guess it depends on what the mistake is and what happens in the case. I don't think there's fine rules like that, Your Honor, respectfully. Okay. I'll get you back in rebuttal then. Thank you, Your Honor. Ms. Neal. Good morning, Your Honor. My name is Laura Neal. I represent the Pennsylvania Department of Corrections at police in this matter, Wetzel, Weiss, and Yale. If you start with the point about the liberty interest here, he was granted a right to go to a community center, and he's anticipating that. And then four days before he goes, they say, whoops, I know we said concurrent, but now we're saying consecutive, and therefore you're not able to go. This seems like it's in that very gray area that he has, in effect, his view is I was granted release to this CCC, and it's now been revoked. And revocation seems to be one that gives you a liberty interest, whereas if it hadn't been granted, he wouldn't have a case, but now he seems to have one. What's your response? Your Honor, there is no gray area here. I want to make it abundantly clear that this was an expectation of release. It is clear that there is no liberty interest that vests even after release to a community corrections center. When did the permission, when was it given to allow him to go to the community corrections center? Apparently, according to the pleadings in the prior history in the case, it was granted sometime in February of 2007. And when was he supposed to be there then? It's not clear anywhere in the record, Your Honor, exactly when he was supposed to be transferred out. One would assume that it would have been sometime around February 2007. When did the Department of Corrections say, whoops, it was consecutive, the sentence, and therefore he doesn't qualify? That also is not clear from the record. It would have been apparently sometime shortly before that. However, I want to make clear that – What I'm trying to say is roughly, to the extent you can guess, what is the time difference between when he was told he was granted the ability, or granted the release to the community corrections center, and when they told him that he no longer was able to go because they were construing his sentence in 2004 to be consecutive, sentences to be consecutive? Again, it's not clear. It looks as though it was probably about three months before, sometime between November or so of 2006 and February of 2007. What happened in November? There was a letter that was sent to the Department of Corrections staff, Mr. Weiss, from Judge Ransom saying, this is what I want. I want my sentence to be consecutive and not concurrent. Based on that letter, the sentence was then recalculated, and Mr. Powell's pre-release classification was rescinded. There is a U.S. Supreme Court case, Iago, that says that rescinding parole before someone goes out does not implicate due process rights. In this case, we're dealing with pre-release. It's important that the court understand that pre-release is a classification status, essentially. Someone who is granted pre-release, it's not pre-parole, it's not parole. This is a Department of Corrections inmate who's a classification status I inmate. When a person goes out to a CCC, they are a Department of Corrections inmate. So it's the same as when they go in the other direction, from General Pop to RHU. Thank you, Your Honor. That is exactly the point that I was going to make. It is exactly the same, except in this case, it's more compelling because the only thing that happened to Mr. Powell was that he remained exactly where he was. Well, I mean, he was teased. I mean, the guys would rather be in a CCC than General Population. You'd admit that, would you not? Oh, absolutely. It's a little bit Kafkaesque to tell the guy he's going to CCC and then say, oh, only kidding. I mean, if that were your eye, we'd be really counting on that, right? Well, first, I would respond by saying that a disappointed expectation does not give rise to a constitutional claim or a claim for constitutional violation. But as a practical matter, inmates are transferred or not transferred for a variety of reasons, a lot of them associated with administrative needs on a daily basis. So if an inmate is supposed to go out for medical treatment, there may be something outside of the department's control that happens that results in the person not going. The same thing happens with court appearances. The same thing happens with transfers from one institution to another. All right, what if we agree with you on that? What's your defense on the argument that this gentleman spent seven months on parole that he should not have had to spend? There's a significant point I want to clear up for the court with that. The Department of Corrections, and this is cited in my brief, the Department of Corrections is not responsible for supervision of parole. It's clear from the record that Mr. Powell was paroled August 31 of 2009. August 31 of what? August 31, 2009. He was released from the department's custody, control, and supervision by law on that date. He was not physically under our control, nor did we have any power. So you're saying he has a claim but not against your client? That is correct. Then who does he have a claim against? If he had a claim that he was going to bring, it would not be against the Department of Corrections. The agency responsible for supervising him on parole is the Board of Probation and Parole. So to the extent that Mr. Powell had a complaint about being supervised on parole, the Department of Corrections appellees have nothing to do with that. So you're saying BPP, I'm saying BPP, it's their responsibility? But who did the calculation here? The Department of Corrections did the calculation, Your Honor. It's clear that when the sentence was recalculated in 2011, it was returned to the initial sentence calculation, which had his maximum sentence date as ending in May of 2012. He was released from the department's custody in August of 2009. So he was released from our custody and supervision approximately three years before his maximum sentence date. So while I agree it is difficult, the fact that his sentence was recalculated after the initial Commonwealth Court case had been rooted out, there was no harm to Mr. Powell other than his disappointed expectation, his hope that he would eventually go out to this pre-release sentence. The district judge and you are suggesting that this is a, with regard to his claims for the 17 months of incarceration beyond when he should have been available for release, and then the seven months of parole supervision more than they claim he should have had, that it's barred by heck. Why is that? Well, Your Honor, first I want to note that we are requesting that the court affirm on other grounds. Our position is not that it's barred necessarily by Heck v. Humphrey. You can only get to Heck v. Humphrey if you assume the incorrect legal assertion that the department wrongfully held him past his maximum sentence date. When in fact it's clear his maximum sentence date ended in 2012, we released him in 2009. So there's no question from the record, the facts in this case make it clear, and the law makes it clear that the Department of Corrections athletes had nothing to do with him after August of 2009. So if you are going to discuss Heck, you have to necessarily assume that we held him wrongly or that somehow. He's saying that the claim is that his conditions of confinement were messed up because of incorrect calculations done by, among others, Mr. Weiss. The recalculation of the sentence did not present an atypical or significant hardship in relation to the ordinary incidents of prison life. So he simply remained at the correctional institution and did not go out. So I know this is tied closely to the due process argument, but the fact of the matter is that this is not something that implicates necessarily the duration of his confinement because his confinement ended with us in 2009. So Heck doesn't apply to the seven-month issue because you weren't responsible for him being held past the date that he was supposed to be held and because the Department of Corrections is not responsible for all of those. That's correct. Yes, Your Honor. I want to go back briefly with respect to just address Young v. Harper, if I can. Sure. And ask it. Young v. Harper, as you know, was an Ohio pre-parole program. Correct. Oklahoma, right? It was. I apologize. I know it was in Osceola. I thought it was Ohio. It was pre-parole anyway. Right. The significant fact that I wanted to address there, though, was that the court noted that there was nothing that made it clear to the inmate that they did not have some expectation of somehow being pulled back. It was similar to parole in the sense that as long as you don't screw up, for lack of putting it better, you would remain out. In Pennsylvania, the regulations, the applicable regulations, make it clear that you have no expectation of remaining out. The Department of Corrections can pull you back at any time for administrative reasons or other reasons such as a misconduct, subsequent criminal activity, something like that. It can be something as simple as a change in family circumstances. I'm surprised you're asking, you're making that distinction, because I thought you would say he was never out. Well, he was never out. In our case, that man, Young, was out for five months. He was at liberty. Right. I thought your argument in this case is, look, you candidly conceded, I think, that any one of us would rather be in a CCC than a general population. That seems a self-evident proposition. But your answer as a legal matter is that does not make it a constitutional claim. There aren't any cases to support the notion that people that get transferred from various stages of institutional confinement have springing liberty interests. Is that correct? Yes, that's correct. Okay. So why does it help you to suggest that Mr. Powell was out? Well, he was not out. He was still in. Because if he was out, it's a different case. You have a tougher argument if he was out. If he was put at liberty at any time, right? Actually, that's my point, is that it doesn't make it a tougher case in Pennsylvania. Because even if you are out, which he was not, so it's clear because he was not out. Okay. You were saying, hypothetically, even if he were out in Pennsylvania, he still wouldn't have refuge under Young v. Harper because the Oklahoma scheme was qualitatively different than the Pennsylvania scheme. That is correct. The regulations expressly provide that you have no expectation in remaining out. You can be pulled back for any reason, including administrative concerns. So there is no state-created liberty interest, even if you get transferred out to a community correction center. Okay. My time is up. The panel has no more questions. If the sentence was calculated correctly at the outset, that is it should have been concurrent, it was strictly concurrent, when would he have been released? The sentence was calculated in 2006 to moot out the Commonwealth Court case, if that's what that is. When did Judge Ransom do the, was it 2004, did the resentencing? She resentenced in 2004, yes. So if he had 1.5 to 3, 1.5 to 3, and 3 to 5, if they were all concurrent, then he would have been completely released as of sometime in 2009. No, he would have been released in 2012. That was when we calculated the sentences. If it was concurrent, it would be 2012? That's correct. Why? Because he had a 5 to 10 year sentence that was imposed. It was 5 to 10 and not 3 to 5? It was 1.5 to 3, 1.5 to 3 running together under Judge Ransom. Judge Brinkley's sentence was 5 to 10. Okay, so his sentence ultimately expired in May of 2012. It was recalculated based on that later letter from Judge Ransom so that he would have reached his maximum sentence date in 2015. When it was returned, all it did was go back to that prior calculation, which ended it in May of 2012. Can you bring Robinson up? Sure. Actually, Judge Hardiman does have a question for Mr. Robinson. If we can just ask him to come up for a moment. Okay. Sorry. We just gave you a dose of what the state gave Mr. Powell. I didn't expect to come here and not argue your honors. Alan Robinson for Michael Potts, you're Chairman of the Pennsylvania Board of Commissioners. Thank you, Mr. Robinson, for indulging me. My question to you is sort of counterfactual. You've got the top dog, and under 1983 we know you need personal involvement, and that seems to provide Mr. Pottinger some refuge. But I'm interested in whether, had the plaintiff sued, the decision-maker at the Bureau of Parole and Probation, who wrongly, grant me that fact, you may not agree, but wrongly kept Mr. Powell on parole for seven months, would you not concede that that could be a viable Section 1983 action? Assuming properly pleaded. Properly pledged facts, I think it would be, I think there's a, not to fight the hypo, but there is, the min and the max is calculated by the Department of Corrections. Parole Board agents take the min and the max and supervise accordingly. I think I would look at this under like a sample VDX analysis, where if there was pledged that there was notice, my sentence is wrong, my max is actually expired, and the parole agent said, too bad, I'm sorry. I'm too busy. Leave me alone. It says what it says. I'm not going to investigate this. And then we later find out that it was in fact true. There could be facts pledged that would support that claim. Those aren't the facts here. In fact, Mr. Zeiger pledged that once he made the phone call, his client was taken off supervision. So he's essentially pledged himself out of sample VDX. If there was a case where we were wrong, and when I say we, I mean the actual person supervising, the person ignoring the plaintiff's claims, there could be a cause of action. I just wanted to make sure this wasn't a whipsaw problem with the DOC and the BPP pointing fingers and then the putative plaintiff is left without a remedy. My only argument in district court is you don't get to see the head of the agency and say he's the head of the agency. Okay, thank you. Okay, thank you. Mr. Zeiger. Good morning again. I would just like to rebut. Counsel twice said, Ms. Neal twice said, that there was a letter from Judge Ransom to the Department of Corrections. And just for clarity's sake, on page A34 of volume 2 of the appellant's appendix, on the opinion from the commonwealth court in the right margin, the first full paragraph after the block quote in the sixth line says, performing this review, the department sought clarification from Judge Ransom regarding her June 16, 2004 sentence. And so this letter that they're referring to is in response to this quote that I just read you. And you can see further down on the page it says, same paragraph, about eight lines down it says, Judge Ransom responded. So it's not like on her own volition she contacted them. In other words, there was an administerial task being performed arbitrarily by Ms. Neal's client. And then it was in response to that that Judge Ransom replied. But, I mean, obviously you're trying to figure it out. And so why wouldn't you go back to the court and say, hey, what did you mean? What did you do? Well, that's exactly where I was going next, Your Honor. On page A36 of volume 2 of appellant's appendix, which is page 6 of the opinion in the right margin, the first full paragraph,  section 5505 of the judicial code in Pennsylvania says that the judge has to say on the record whether it's consecutive or concurrent. And so by that not being present, or actually by her saying it earlier in the opinion, she says, I intend this to be concurrent to all other matters. There's nothing unclear about that. There's no need for them to arbitrarily contact her for clarity when the order and the record are clear from the sentencing court where it says concurrent to all other matters. So I only bring up these parts of this opinion because I believe everyone's agreed to adopt these facts based on the previous pleadings. And so if that's the case, it's just not so that Judge Ransom just contacted them. They did that on their own, and they shouldn't have. They had no reason to do it. And the court, as I said earlier, points to Brandt to say Brandt doesn't apply to this situation. Is Iago an impediment to your liberty claim? I'm sorry. I'm unfamiliar with Iago. You're unfamiliar with Iago? Perhaps I'm just spacing right now. It's okay. It's the Supreme Court case, I guess, from the 60s. It's a procurium. Brennan and Marshall were dissenting. I'm against it, Judge. I'm sorry. You know, the problem is that that was really funny, but I'm not sure that it was necessarily funny in a good way for you. So this is the holding, and then I just want you to comment on it. So it's implied contract acts of mutually explicit understandings has far more useful place in determining protected property interests than in determining liberty interests protected by the due process clause of the 14th Amendment. And though the inmate was notified that he was being released, his expectation was not protected liberty interests, which could not be taken from him without affording him procedural due process. So it's a similar case. It is an Ohio case. We're not in Oklahoma. That was the other case, I guess. And, you know, obviously it's a similar situation. So if you're not familiar with it, can I give you enough for you to comment? I mean, based on what you just read, my argument back to that would be that, you know, the other cases that we're talking about, specifically Young v. Harper, the Oklahoma case is a 1997 case, and that case you just cited too is over 50 years old. And so I would say that, you know, we all know that Young v. Harper can easily be distinguished. You're asking for an extension of Young v. Harper. Would you admit that? I am asking for an extension, but there's no case in this circuit, though, where when this situation happens, it's not based on the conduct of the appellant. So it's not so unreasonable, respectfully, to your honor. I mean, all the cases that they cite to in their brief, the appellant is doing bad things. They're violating rules at places. I mean, that's a situation where your pre-rules should be revoked. Your parole should be revoked. All of those things should happen. Here, my client didn't do any of this. Well, that's speaking only for myself. You make an interesting, equitable argument, sort of a moralistic argument that I think has a lot of heft to it. The difficulty is you run into a lot of case law that draws fairly stark lines about where liberty interests begin and end. And you're asking for us to extend that line, right? And distinguish it based on facts. It's not just saying, well, none of those other cases have had this fact. You want us to say that the liberty interest can be defined, and correct me if I'm wrong, but as I hear you, you're asking us to define the liberty interest in some measure based upon the egregiousness of the state misconduct. Yes, but I'm also asking you to say that the analysis begins once it's granted, once that original pre-release was granted. Correct. Okay, thank you. I would like, if I could, to have a transcript prepared of this oral argument if the commonwealth will pick that up, but just check with the clerk's office, if you would, please. Thank you.